```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
ELVIN HARRIS,

                    Petitioner,            MEMORANDUM & ORDER
                                           08-CV-4886(JS)
          -against-

UNITED STATES OF AMERICA,

                    Respondent.
----------------------------------------X
APPEARANCES
For Petitioner:    Richard M. Langone, Esq.
                   Langone & Associates, PLLC
                   3601 Hempstead Turnpike, Suite 410
                   Levittown, NY 11756

For Respondent:    Christopher Allen Ott, Esq.
                   United States Attorney's Office
                   610 Federal Plaza
                   Central Islip, NY 11722
```

SEYBERT, District Judge:

  Petitioner Elvin Harris ("Petitioner") petitions this Court pursuant to 28 U.S.C. § 2255 to vacate his sentence and conduct a resentencing. On July 20, 2011, the Court conducted an evidentiary hearing and reserved judgment. For the reasons that follow, Petitioner's application is GRANTED.

## BACKGROUND

  In January 2003, Petitioner, a member of the Bloods gang, was arrested and charged in an eight-count Indictment for offenses arising out of a series of armed robberies in the Hempstead area of Nassau County, New York. (Pet. Ex. A, Pet. Aff. ¶ 2; Gov't Resp. 3.) Shortly after his arrest, his court-

appointed attorney, Anthony LaPinta, Esq. ("LaPinta"), "upon learning of the facts of the case and the various admissions that [Petitioner] gave to his involvement in those crimes . . . tried to strike a cooperation agreement" with the U.S. Attorney's Office. (Tr. 6.)[1] On June 25, 2004, after meeting with the U.S. Attorney's Office approximately three-to-five times to discuss "the historical background of the Bloods gang and [Petitioner's] involvement in the organization that was present in Hempstead" (Tr. 7), the parties entered into a cooperation agreement ("Agreement") (Pet. Ex. B, Cooperation Agreement). The Agreement provided, in part, that Petitioner:

> (1) plead guilty to Counts Three, Four, Seven and Eight of the Superseding Indictment charging violations of 18 U.S.C. § 1951(a) and 18 U.S.C. § 924(c)[2] (Pet. Ex. B. ¶ 1); and
>
> (2) "provide truthful, complete and accurate information and . . . cooperate fully with the [U.S. Attorney's] Office" (Pet. Ex. B. ¶ 3).

In exchange, if the Government determined that Petitioner "cooperated fully, provided substantial assistance to law enforcement authorities and otherwise complied with the terms of [the Agreement]," it would file a 5K1.1 motion on his behalf,

---

[1] "Tr." refers to the transcript of the evidentiary hearing held on July 20, 2011.

[2] Counts Seven and Eight, the firearms counts, carry a total mandatory minimum sentence of 30 years to run consecutive to any sentence prescribed by the Sentencing Guidelines for Counts Three and Four, the robbery counts. (Pet. Ex. B, ¶¶ 1-2.)

permitting the Court to impose a sentence below the applicable Sentencing Guidelines range and any mandatory minimums. (Pet. Ex. B. ¶ 6.) The Agreement further provided that:

> Should it be judged by the [U.S. Attorney's] Office that [Petitioner] . . . <u>has committed or attempted to commit any further crimes</u>, or has otherwise violated any provision of this [A]greement, [Petitioner] will not be released from his plea of guilty but this Office will be released from its obligations under this [A]greement, including (a) not to oppose a downward adjustment of three levels for acceptance of responsibility . . . , and (b) to file the [5K.1.1] motion . . . .

(Pet. Ex. B. ¶ 8 (emphasis added).)

On June 25, 2004, Petitioner pled guilty before the undersigned to the Counts agreed upon in the Agreement and described his involvement in the armed robberies for which he was arrested. (Pet. Ex. C, Transcript of Pleading.) The first took place on or about January 4, 2003 and involved the robbery of a Chinese-food deliveryman. Petitioner and his co-defendant placed a false order for delivery. When the deliveryman arrived, they restrained him, threatened him with a handgun, ordered him to "give it up," and "knocked him out." (Pet. Ex. C, at 18-19.) The second took place on or about January 6, 2003 and involved the robbery of an oil delivery man. Petitioner and the same co-defendant "walked in front of the oil delivery man and brandished a handgun and told him to give [them] the money." (Pet. Ex. C., at 22.) This Court accepted Petitioner's guilty

plea and scheduled sentencing for September 2004.  (Pet. Ex. C, at 25.)  Sentencing was adjourned multiple times so Petitioner could continue to cooperate with the Government.  During this time, Petitioner was incarcerated in the Nassau County Correctional Center.

On July 29, 2005, the Government ultimately decided that Petitioner provided "substantial assistance in the prosecution of the Bloods violent street gang," and submitted a 5K1.1 letter-motion stating that:

> Harris' cooperation was helpful in providing useful background information on the history, formation and activities of the Bloods on Long Island.  In addition, Harris, has provided information about his unindicted co-conspirator and Blood member Dougie Young.  This information may assist in a future prosecution of Young.

(Pet. Ex. D, 5K1.1 Letter.)

A sentencing hearing was held before the undersigned on September 16, 2005.  (Pet. Ex. E, Transcript of Sentencing.) At the hearing, the Court discussed the sentence recommended by the Probation Department in the presentence report ("PSR"):  The robbery counts (Counts Three and Four) each carried a Guidelines sentencing range of 84 to 105 months,[3] to run concurrently, and the firearms charges (Counts Seven and Eight) carried mandatory

---

[3] Probation determined that Petitioner was in Criminal History Category V and his total offense level was 23. (Pet. Ex. E, at 6-7.)

4

minimum sentences totaling 30 years, to run consecutive to the sentence imposed for Counts Three and Four. (Pet. Ex. E, at 4.) Probation recommended a term of 444 months--the minimum sentence permitted without the Government's 5K1.1 motion.

At this point, however, LaPinta assumed that, given the Government's 5K1.1 motion, the Court would sentence Petitioner to a total of 84 to 105 months--the applicable Guidelines range. In his experience, he has never seen a Court sentence a client who had received a 5K1.1 letter to a term above the Guidelines range. (Tr. 14.)

The Government then updated the Court on the extent of Petitioner's cooperation as outlined in its 5K1.1 letter. Since filing the letter, "[b]ased on the information provided to the [G]overnment on [Petitioner]'s behalf by family members," Dougie Young was arrested and charged in the state system for unrelated crimes. (Pet. Ex. E, at 7-8.) The Government also added that, since filing the 5K1.1 motion, Petitioner was arrested by Nassau County Police after they found a metal shank hidden in a toothbrush holder in his cell at the Nassau County Correctional Center. (Pet. Ex. E, at 8.)

Prior to this moment, LaPinta was not aware of these charges pending in Nassau County:

> I didn't know about the shank in his cell
> until we were actually present during the
> sentencing hearing. I had met with Mr.

5

> Harris earlier that morning, as I normally do with clients prior to court appearances. He didn't mention anything to me about that, nor did Assistant U.S. Attorney Peter Katz mention anything to me prior to the sentencing hearing. I first learned of it while we were actually involved in the sentencing hearing itself.

(Tr. 13.) He then "turned to Mr. Harris and asked him whether or not he was charged with this, and he did tell [him] he had pending charges in Nassau County." (Tr. 13.) Although he was concerned that the Government may seek to retract its 5K1.1 motion, he did not request an adjournment or question his client further. (Tr. 13-14.) Instead, LaPinta directed the Court to "certain highlights" in the PSR including, Petitioner's young age, his use of drugs and alcohol from a young age, the lack of structure or guidance in his life, and his acceptance of responsibility. (Pet. Ex. E, at 9-10.)

Counsel then discussed the extent of Petitioner's cooperation. LaPinta stated that "[i]t hasn't been an easy road especially since he has been incarcerated for the last two and a half years. We tried to assist the Court, but the only resource we can use are []his family members who have had relations and knowledge of people who have been the target of law enforcement." (Pet. Ex. E, at 12.) The Government described Petitioner's cooperation as "underwhelming," stating that "Mr. Harris was in jail, his family attempted to help him. . . . I

think there was more they could have done. They didn't." (Pet. Ex. E, at 15-16.)

The Court ultimately sentenced Petitioner to a total of 400 months--40 months each for Counts Three and Four to run concurrently, plus an additional 360 months for Counts Seven and Eight. (Pet. Ex. E, at 20-21.) Before imposing its sentence, the Court reflected on the violent nature of the crimes, stating:

> And I look at these poor people whom you just felt had to supply . . . you with money, for whatever reason. . . . It is outrageous, it really is. There is no excuse in that. And you did it over a two, three month period, and it was a reign of terror. And if you couple it with the fact that you have no problem pointing the gun at . . . any of the people, that frightens me.

(Pet. Ex. E, at 17-18.) The Court also discussed the likelihood of recidivism:

> Are you coming back? You are back. There is no doubt in my mind. You will be back. You are going to commit one crime after another, after another. And that's clearly displayed in the most recent charge. Oh, it's a jail violation, and it is not that big of a deal? It is a big deal. You are continuing the same lifestyle that you had prior to your arrest, as depicted by your multiple convictions. And you will continue that, Mr. Harris, straight on through the next 30 plus years, no doubt about it.

(Tr. 18.) The Court concluded:

> It is not a happy day to have a judge look at a defendant and say, you know, I'm putting you in jail for the next 30 plus years. It is not a good situation. You deserve it. And the rest of the community deserves to be protected from the type of activity you are and have been engaged in.

(Tr. 20.)

Petitioner challenged the reasonableness of his sentence on appeal to the Second Circuit. The Second Circuit affirmed the sentence, stating that it "was reasonable in light of Harris' conduct while in custody." <u>United States v. Campbell</u>, 239 Fed. Appx. 692 (2d Cir. 2007). He did not petition the U.S. Supreme Court for a writ of certiorari.

Petitioner filed the instant petition for habeas corpus on December 4, 2008 claiming ineffective assistance of counsel--namely that LaPinta's decision not to investigate the circumstances surrounding his possession of the shank in custody was unreasonable and resulted in a significantly higher sentence. On April 18, 2011, this Court ordered an evidentiary hearing, which was held on July 20, 2011. At the hearing, the Court heard testimony from both LaPinta and Petitioner. Petitioner testified that he had the shank for self-defense because Dougie Young had "ordered a hit out on [him]." (Tr. 37.) When asked why he chose to arm himself rather than go into protective custody, Petitioner stated that "[p]rotective custody ain't like you go to another housing unit like they have in the

8

feds. . . . I would still be around the same individuals." (Tr. 37.) Since being sentenced, Petitioner has been transferred in an out of five different federal penitentiaries and correctional institutions because "they didn't know what to do with [him], to protect [him]." (Tr. 48.) He testified that upon entering a new facility, Blood members who were incarcerated there would see his gang tattoos and ask to see his "paperwork," in order to determine whether he was a cooperator. (Tr. 40-41.) Petitioner would ultimately volunteer to enter protective custody. Since being sentenced in 2005, Petitioner has served nearly half of his sentence in protective custody, which requires that he be "locked down" for twenty-three hours per day with no phone or visitor privileges and "no human contact with other inmates; just in there by [himself]." (Tr. 41-45.)

## DISCUSSION

To sustain his claim of ineffective assistance of counsel, Petitioner must demonstrate that (1) counsel provided deficient performance and (2) there was prejudice as a result. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A petitioner must satisfy both prongs of the Strickland test to be entitled to relief. Id. The Court will address each in turn.

9

I.   Deficient Performance

To establish deficient performance, a petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and show that "counsel's representation fell below an objective standard of reasonableness." Id. at 688-89. Petitioner alleges that LaPinta was ineffective because he failed to investigate the circumstances surrounding the Petitioner being caught with a shank in his cell.

In Strickland, the Supreme Court addressed an attorney's duty to investigate, stating that:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible opinions are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91; see also, e.g., Rompilla v. Beard, 545 U.S. 374, 389, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (finding that counsel's failure to examine a file on defendant's prior conviction for rape and assault that "he knows the prosecution

10

will cull for aggravating evidence" at sentencing phase of capital murder trial was unreasonable); Wiggins v. Smith, 539 U.S. 510, 524-26, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (finding that counsels' "abandon[ing] their investigation of [capital defendant]'s background after having acquired only a rudimentary knowledge of his history from a narrow set of sources," including the defendant himself, was unreasonable).

Although Strickland and its progeny discuss the duty to investigate in the context of the sentencing phase of a capital murder trial, the duty is not so limited. The American Bar Association's Standards for Criminal Justice state that defense counsel, in all cases, "should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." ABA Standards for Criminal Justice 4-4.1 (3d ed. 1991).[4]

Here, LaPinta testified that he first became aware of the charges pending in Nassau County against Petitioner during the sentencing hearing (Tr. 13; Pet. Ex. E, at 8) after which he "briefly turned to Mr. Harris as [they] were standing before the Court and asked him whether in fact it was true. And he said

---

[4] The Supreme Court has repeatedly stated that courts should look to the American Bar Association standards as "guides to determining what is reasonable" conduct. Strickland, 466 U.S. at 688; accord Wiggins, 539 U.S. at 524; Rompilla, 545 U.S. at 387.

11

that, yes, it was true" (Tr. 23). He testified that he was concerned that the Government would seek to retract the 5K1.1 letter: "I wasn't quite sure how the process was going to evolve . . . . In light of that, I decided to just go forward on the case." (Tr. 14.) He did not seek an adjournment, question Petitioner further, ask the Government to review its documentation regarding the alleged charges, or mention the shank at all during the pendency of the sentencing hearing. Rather, he testified, "I don't know, you know, what type of mitigation I could put forward to having that shank." (Tr. 26.)

While "[s]trategic choices made after thorough investigation . . . are virtually unchallengeable," Strickland, 466 U.S. at 690, that was not the case here. LaPinta merely asked Petitioner if there were charges pending. This is insufficient. See Rompilla, 545 U.S. at 387 ("The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt . . . ."); ABA Standards for Criminal Justice 4-4.1 (same). LaPinta testified that he did not know whether the Government would seek to withdraw its 5K1.1 letter because Petitioner breached the terms of the Agreement by committing a new crime--yet he did not know, and failed to find out, whether Petitioner did, in fact, commit another crime. LaPinta did not know if Petitioner had pled guilty, with which crimes he was actually charged, or any

of the details surrounding the incident--who found the shank, whether it belonged to Petitioner, or if any defenses were available.

Additionally, the Supreme Court has stated that the duty to investigate is heightened when the documents are readily available--where, as here, the information is in the possession of the Government. Rompilla, 545 U.S. at 387, 389-90 ("The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense."); ABA Standards for Criminal Justice 4-4.1 ("The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities.").

Since there was no thorough investigation of the charges pending in Nassau County, the question becomes whether it was reasonable for LaPinta to believe that no further investigation was necessary. Given the risk as perceived by counsel that the Government would withdraw the 5K1.1 letter because Petitioner allegedly breached the Agreement, the Court finds that it was unreasonable for LaPinta to stand by in silence as both the Government and the Court harped on the fact that the shank was "evidence of incorrigibility." (Tr. 13, 32; Pet. Ex. E, at 15.) At a minimum, he should have requested a short recess to discuss the pending charge and its implications

with his client. Thus, Petitioner has satisfied the first prong of the Strickland test.

II. Prejudice

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Strickland, 466 U.S. at 691. To show prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534.

It is clear that this Court imposed the sentence that it did--well above the 84 to 105 month Guidelines range--because Petitioner was caught with a shank. (Tr. 20.) The Government argues that knowledge of the reason why Petitioner possessed the shank would not have impacted the Court's sentence--that the Court imposed the sentence that it did because Petitioner was continuing a life-of-crime. According to the Government, the fact that he possessed the shank for self-defense does not make the conduct legal. While this is true, the Court sees the rationale for possessing the shank as changing the character of

the offense. The Court viewed the shank as evidence of Petitioner's continued gang-involvement, overall violent lifestyle, and inability to be rehabilitated. The Court is well-aware of the dangers that cooperating gang-members face in prison,[5] and possession of a shank in those circumstances--to defend oneself from attack--is quite different from possessing the shank to commit crimes and gang-related violence as Petitioner had done repeatedly in the past.

The Court, having full knowledge of the reasons why it sentenced Petitioner the way it did, finds that there is more than a reasonable probability that it would have sentenced Petitioner differently if it had known that Petitioner had the shank for self defense.

---

[5] This is confirmed by Petitioner's testimony at the hearing. Since 2005, Petitioner was transferred in an out of five different federal penitentiaries and correctional institutions because "they didn't know what to do with [him], to protect [him]." (Tr. 48.) And he spent half of that time in protective custody because Dougie Young "ordered a hit out on [him]". (Tr. 37-44.)

CONCLUSION

For the reasons stated above, Petitioner's request pursuant to Section 2255, for a writ of habeas corpus is GRANTED.  The Petitioner's sentence, ordered by this Court on September 16, 2005, is hereby VACATED.  The Court ORDERS that Petitioner be resentenced.  The resentencing will take place before the undersigned on Friday, November 18, 2011, at 11:00 a.m. in Courtroom 1030.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:   October   7  , 2011
         Central Islip, NY